DOWDY v. GEORGIA RAILROAD COMPANY, and *vice versa.*

1. The evidence showing that the plaintiff's husband could, by the exercise of ordinary care, have avoided being killed by the engine, she is not entitled to recover for his homicide, even though the defendant's engineer may have been in some degree negligent, and the court did not err in granting a nonsuit.

2. The court did right, on motion of defendant's counsel, to rule out the testimony of a witness that "the engineer had time to blow the whistle before the deceased was struck," and in refusing to allow plaintiff's attorney to ask the witness "if the engineer didn't have time to signal the approach of the engine, and had he done so, would the deceased not have had time to have gotten off the track?" the court ruling: "You can show all the facts, and it is for the jury to draw conclusions from the facts."

*Judgment affirmed on main bill ; cross-bill dismissed.*

BLECKLEY, C. J., dissenting. Where a footman in daylight, at a place used by the public as a passway for thirty years, steps upon a railroad track in front of an engine, but long enough to walk upon the track thirty feet before he is run down and killed, it is a question for the jury whether it was wantonness in the engineer not to give a signal for him to get off.

February 15, 1892.

Railroads. Negligence. Evidence. Nonsuit. Before Judge JENKINS. Greene superior court. March term, 1891.

Action by the widow of Dowdy for damages from his homicide by the railroad company. She excepted to the grant of a nonsuit, and to the ruling out of testi-

mony. The defendant excepted to the overruling of its demurrer to the declaration.

The declaration alleged that on July 1, 1890, at the time Dowdy was killed, he was on his way to the defendant's depot at Union Point, intending there to take its train as a passenger to Athens, a station on its line of road, and in order to reach the depot he had to walk down its road-bed between the main line track and a siding, the space between these tracks being the passway for passengers to use in approaching the depot, and the only way provided by the defendant for approaching its depot by persons residing in that portion of Union Point where Dowdy resided; that this space or passway had been used by the public for over thirty years, with the full knowledge and consent of the defendant, and was as much frequented as any thoroughfare in the village; that the defendant had invited and encouraged the use of this walk, or passway, by the public, in placing steps at that end of its depot for the convenience of persons coming from that direction intending to board its train, and by placing at intervals crossings leading to this passway, for the use and convenience of such persons; that it was necessary for Dowdy, in order to reach the depot, to cross one of the tracks next to it, and he was in the act of doing so when, without any fault or negligence on his part, he was knocked down and killed by the engine and cars of the defendant, which ran rapidly upon him from his rear until they were so close when discovered that he, not being aware of their approach, was unable to avoid the injury; that said injury was caused by the rapid and reckless running of the defendant's train known as the "fast train," its speed being twenty-five or thirty miles per hour at a point near the depot; that the defendant's servants neglected and failed to blow the whistle or toll the bell of the locomotive, and to simultaneously check and keep

checking the speed of the engine while approaching a public road crossing, within two hundred yards of which Dowdy was killed; and that had the defendant performed either of these statutory requirements, the accident could not have occurred. By amendment it was alleged that Dowdy was going to the defendant's depot, and had walked for thirty steps down the track when he was struck by the train; that the defendant's employees and the engineer in charge of the train failed to warn him of his danger; and that he had ample time to have done so, and had he done so Dowdy could have got off the track.

The testimony was, in substance, as follows: Dowdy was seen going down the railroad track in the direction of the depot; said he was in a hurry as he was going off on the train to Athens. He was killed beyond the public crossing, between the crossing and the depot. The blow-post before reaching the crossing is situated just in front of the house of a witness who saw the train that killed Dowdy as it passed her house; was attracted to the right of way because she heard the train blow about a mile off. She did not hear the train blow or the bell ring, nor could she tell that the train was slackened on approaching the crossing. The train slackened its speed just before reaching the crossing, but it was running at the rate of twenty-five miles an hour at the crossing. It was the fast train of the defendant, running on the Athens branch. There was no public road or street on either side of the railroad. Dowdy was walking down the track that is used by the people living in that portion of Union Point. This track is frequented as much as any street at Union Point. The railroad authorities have prepared footcrossings for the people to use in approaching the depot; Dowdy was killed within thirty or forty yards of one of these crossings. He lived about a quarter of a mile

from the depot. There is no way to get to the depot from where he lived, except to come down the railroad track or go around back of the mill, which would make it a third further, at least, than to go down the track. It is between three and four hundred yards from the public crossing to the depot. Dowdy was killed within sixty or seventy yards of the depot. After striking him the train did not stop until it reached the depot. It was a windy morning; the wind was blowing from the east; and Dowdy was walking towards the east. The track is on an embankment twelve or fifteen feet high, and a part of the Ogeechee river runs under the embankment. The people living up in that part of Union Point can approach the depot only on this embankment, or go twice as far around the mill. All the people living along up the Athens branch use this track to approach the depot. People pass along there every hour of the day, frequently as many as a dozen going to and coming from the depot, which use has been continued for thirty or forty years. There are crossings for foot-passengers along this track. There are three or four tracks on the embankment. One could go from Dowdy's house to the depot by going around by the mill, but this route is very rough and makes a complete elbow. There are steps at the rear of the depot for people to use coming down the embankment, and by crossing this gangway reach the depot; these steps are used for that purpose by the public. They are on the right of way of the defendant. Dowdy was killed about ten o'clock in the day. He was going towards the depot, and had to cross one of the tracks to get there. He walked about thirty feet before he was struck. A witness who saw him and the train did not hear the whistle blow; would have heard it if it had done so. The engineer did not ring his bell. If he rang his bell or blew his whistle or slackened the speed

at the public crossing just before reaching the depot,
witness did not notice it. When witness first saw
Dowdy he was walking down the center of the middle
track; he then stepped off and walked between the
tracks, and then stepped on the side-track and walked
down it about thirty feet before the train struck him.
If he had looked back he could have seen the train
coming for half a mile. He looked back just as the
train struck him; he was walking rapidly in the direc-
tion of the depot when struck. (This witness stated
that the engineer had time to blow the whistle before
Dowdy was struck, which statement was ruled out on
defendant's motion. Plaintiff's counsel asked the wit-
ness if the engineer did not have time to signal the
approach of the engine, and had he done so would
Dowdy not have had time to have got off the track?
The court sustained defendant's objection to this ques-
tion.) Another witness testified that he was standing
on the platform, and his attention was not particularly
called to the train until some one exclaimed that it had
hit Dowdy; and that he could not say positively whether
they rang the bell or not, did not hear it if they did,
and was close enough to have heard it had they done
so. Dowdy and his wife lived very near the railroad
track. She testified that he had been to the depot that
morning, had forgotten something, came back for it
and went off in a big hurry, afraid he would miss his
train, leaving the house before the train came; that she
did not hear the whistle blow or bell ring that morning
as the train approached the crossing; that she and her
husband were both familiar with the running of the
trains; and that "the train that killed him turned right
around at the depot to go back to Athens, and it was
this train he was going to take." Another witness tes-
tified that Dowdy was killed within ten or twenty steps
of a foot-crossing near the depot, which crossing was

used by the public who transacted business with the railroad; that he was killed just a little west of the track crossing the path; and that the engineer could have seen him half a mile down the track, and he could have seen a train several minutes before it struck him if he had looked back. There was also testimony as to the value of the life of the deceased.

JOHN C. HART, for plaintiff.

J. B. CUMMING and BRYAN CUMMING, for defendant.